UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                              :
YA-CHEN CHEN,                                 :
                                              :
                           Plaintiff,         :
                                              :
                                              :           No. 11 Civ. 0320 (RA)
               -v-                            :
                                              :           OPINION AND ORDER
THE CITY UNIVERSITY OF NEW YORK,              :
et al.,                                       :
                                              :
                           Defendants.        :
                                              :
--------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

     Plaintiff Ya-chen Chen brings this employment discrimination action against her former

employer, the City University of New York ("CUNY"), and Robert Paaswell, Beth Lesen,

Richard Calichman, and Geraldine Murphy ("Individual Defendants"). Chen asserts claims for

unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the

New York City Human Rights Law ("NYCHRL") and an equal protection claim under 42 U.S.C.

§ 1983. Before the Court is Defendants' motion for summary judgment on all claims. For the

reasons discussed below, Defendants' motion is granted in its entirety.

## BACKGROUND[1]

     Ya-chen Chen, who self-identifies as an "Asian, foreign-born female," was a tenure track

assistant professor in the Foreign Languages and Literatures Department of the City College of

New York ("CCNY"), a senior college within CUNY. (Pl.'s 56.1 ¶¶ 1, 15.) Her employment at

CCNY began on September 1, 2007, for the period from September 1, 2007 through August 31,

---

[1]     The following facts are taken from Defendants' Rule 56.1 Statement of Undisputed Material Fact
("Defs.' 56.1"), Plaintiff's Counterstatement ("Pl.'s 56.1"), and the exhibits attached to the parties'
submissions.

2008.  (Id. ¶ 16.)   As a non-tenured professor, Chen's employment was subject to annual reappointment.  (Id. ¶ 15.)  In late 2008, she was reappointed for the 2009-2010 period.  (Id. ¶ 17.)  She was also appointed to serve as Acting Director of Asian Studies for a one-year term, for the period from September 1, 2008 to August 31, 2009.  (Id. ¶ 38.)

***Initial Complaints about a Student's Behavior***

In January 2009, a Caucasian male student (the "Student") enrolled in Chen's Chinese Language class and engaged in behavior that she "perceived to be inappropriate and to constitute stalking or harassing her."  (Id. ¶ 18.)  Such behavior allegedly included spending inordinate amounts of time in Chen's office hours and blocking the doorway to the Asian Studies Program offices before class.  (Christopher Coulston Declaration, Aug. 16, 2013 ("Coulston Decl."), Ex. P.)  Chen reported the behavior to the Chair of the Foreign Languages and Literatures Department, Richard Calichman.  (Ya-chen Chen Deposition, May 10, 2011, Mar. 7, 2012, Apr. 5, 2012, and Aug. 3, 2012 ("Chen Dep.") 26:5-25, 28:5-7.)  In response to Chen's complaint, Calichman transferred the Student to another section.  (Pl.'s 56.1 ¶ 19.)  In May 2009, Chen was informed that the Student planned to register for her upper-level Chinese language course the following fall.  (Id. ¶ 20.)  Concerned, she reached out to Calichman.  (Chen Dep. 38:10-12.)  At his direction, she reported her concerns to Geraldine Murphy, Deputy Dean of Humanities at CCNY.  (Pl.'s 56.1 ¶ 21.)

During their meeting, Murphy probed Chen on the Student's behavior.  She asked whether the Student was "physically threatening" and whether the way he blocked the doorway "was sexually suggestive."  Chen replied no to both inquiries.  (Geraldine Murphy Deposition, May 6, 2012 ("Murphy Dep.") 39:5-13.)  Murphy then referred Chen to Beth Lesen, Director of the Office for Students with Disabilities, for advice on how to deal with the Student.  (Pl.'s 56.1 ¶ 23; Chen Dep. 46: 8-47:11; Murphy Dep. 38:22-39:21.)

Chen met with Lesen on May 7, 2009.  (Pl.'s 56.1 ¶ 24.)  She claims that during this meeting, Lesen advised her to "confront" the Student and to "set up boundaries." (Id. ¶ 25.)  She explains that Lesen provided examples of how Chen could set boundaries, including advising the Student to find a tutor if he was using up too much of her time during office hours.  (Chen Dep. 52: 21-53:18.)  After the meeting, Lesen sent Chen the following email:

> It was a pleasure meeting with you today.  Please do let me know how things go with that student and if the situation does not improve after you have created some boundaries with him, I will be happy to step in and assist you further.

(Coulston Decl. Ex. G.)   Based on the meeting with Lesen, and Lesen's follow-up, Chen believed that Lesen wanted her to set up these boundaries immediately, before the end of the semester.  (Chen Dep. 53:2-55:9).  She describes her interpretation of the email as follows:

> [T]his e-mail was sent to me late afternoon, May the 7th, which was almost the final—like the final second week of the semester.   And the final sentence let me feel that she wanted me to confront the [S]tudent, you know, immediately, because the semester was almost over.  If you do not do this, people will be away.  And definitely keep me posted.  This kind of message on May 7th doesn't look like you wait till next semester, five months later, in September or late August.  So I assumed that she wanted me to do—according to what she wanted me to do in, you know, the final first week or—I mean, the final week or the final second week.

(Id. 54:19-55:9.)  Lesen, by contrast, denies ever suggesting that Chen should interact with the Student before the end of the semester.  Instead, Lesen explains that she "specified [that Chen] was not to deal with these behaviors before they actually occurred."  (Deposition of Beth Lesen, March 8, 2012 ("Lesen Dep.") 84:6-8.)

### Presentation of the Written Document to the Student

On May 13, 2009, Chen met with the Student with another professor as a witness.  (Pl.'s 56.1 ¶ 25.)  During the meeting, Chen "clearly told [the Student] . . . that it's entirely student freedom to choose whatever courses."  (Chen Dep. 60:24-25).  She then presented the Student with a document titled "Ya-chen Chen's Written Document for [the Student's] Confirmation of

Understanding (to avoid different versions of the same story)."  (Coulston Decl. Ex. H.)  The

document outlined the following "rules" to which the Student was to agree before enrolling in

Chen's class:

> Chinese tutor as the front line for academic questions or learning problems
> Maximum use of my office hours: five to ten minutes every week
> Do not block the doorways of classrooms or offices
> Keep an appropriate distance from professors and classmates
> Class matters should be first brought to the instructor, not administrative heads
> Harmony with classmates and respect for the instructor
> Do not rush the instructor before the class starts [and]
> The instructor reserves the right to take actions against unpredicted or uncomfortable situations

(Id.)  As indicated by the title of the document, Chen explained that she presented the boundaries

in written form to protect herself so that the "[w]ritten form can be the only version of the same

story."  (Chen Dep. 61:19-21.)  Chen also explained that she believed that she was simply

"set[ting] up boundaries" as directed by Lesen, (id. 61:3-4), as evidenced by the preface to the

above list, which read: "According to Dr. Beth Lesen's opinion, I am writing down the rules for

[the Student's] Participation in my CHIN 225 class in fall 2009.  Professor Chih-ping Ma is the

witness." (Couston Decl. Ex. H.)

 The Student did not sign the document and went to Lesen's office "upset and in tears."

(Lesen Dep. 70:8.)  He recounted what had happened and explained that "no one had ever told

him that Dr. Chen had any problems with him."  (Id. 70:18-20.)  Chen also went to Lesen's

office that day to provide her account of what had happened and to ask Lesen to step in and

provide assistance.  (Pl.'s 56.1 ¶ 28; Chen Dep. 62:20-63:3.)  According to Chen, Lesen advised

Chen to say "stop" to the Student and asked Chen to repeat "stop" after her six or eight times:

> [Lesen] yelled very loudly at me and asked me to repeat a very, very simple
> English word, stop, stop, stop, many, many, many times, maybe six or eight
> times, and ask me to read it after her . . . And the voice was very loud and her
> physical gestures, like, body language, was, like . . . very, very violent and very,
> very big physical gesture.  And I was very, very shocked . . . I feel I was very,

very humiliated.

(Chen Dep. 64:13-65:19.)  Chen describes these actions as "linguistic racial discrimination."  (Id. 64:13-14.)

Recounting the meeting in an email to Calichman, Lesen wrote that Chen "spent hours (literally) refusing to accept any responsibility for her own actions" and that the meeting "was one of the most frustrating meetings I have ever had with a professor."  (Coulston Decl. Ex. G.) Lesen reported that Chen expressed concern about "whether this incident would somehow negatively impact her career" and asked whether "there was anything else she could do that would make her look better in this situation."  (Id.)  Lesen further explained that two days later, on May 15, 2009, the Student came back to her office "because he found out that [P]rofessor Chen contacted Professor Ma to find out what his impressions of the [S]tudent are and whether he behaves poorly with him or in the class."  (Id.)  In this email, Lesen attached the following email Chen had sent after their May 13, 2009 meeting, which Lesen described as "an inaccurate representation" of their conversation and "quite inappropriate":

> According to what you orally said to me today, you will take follow-up actions to contact [the Student] tomorrow and take your own notes about your version of this story.  I hope to have a copy of your notes or written records about what your version of this story is.  If you disallow me to have a copy of your written records of it, please do give me a written or emailed version of your refusal.

(Id.)

Professor Calichman subsequently forwarded Lesen's email and attachments to Dean Reynolds, noting that "Chen's behavior seems to [be] becoming increasingly erratic" and asking whether he should mention this in his annual evaluation "so as to create a paper trail."  (Id.) Reynolds agreed that it should be made part of her evaluation and suggested that Calichman hold a conference with Chen with Dean Murphy as a witness.  (Id.)

***Counseling Memorandum***

On May 20, 2009, Chen attended a counseling meeting with Calichman and Murphy. (Pl.'s 56.1 ¶¶ 30-31.)   During that meeting, Calichman provided the following points of guidance, which were memorialized in a counseling memorandum that was placed in Chen's personnel file, (id. ¶ 32):

> 1) It is inappropriate to intervene with students who are not currently in one's class; 2) It is inappropriate to recruit other professors for help in such intervention; 3) It is inappropriate to present and pressure [students] into signing a contract-like document listing certain conditions that must be satisfied in order for students to enroll in one's course; and 4) It is inappropriate to conduct what is, in effect, a smear campaign against students by requesting other faculty to provide negative information about said student.

(Coulston Decl. Ex. I.)

***Annual Evaluation***

On May 21, 2009, Calichman completed an annual evaluation for Professor Chen.  The evaluation noted Chen's "fine teaching record," her "service to the department as well as to the college as a whole," and her commendable "productivity as a scholar."  (Id. Ex. L.)  Calichman also commented on "the matter of collegiality."  In this regard, he wrote:

> My remarks in last year's evaluation touched upon her overaggressiveness and lack of tact, as perceived by several of her colleagues.  Comments of this nature have continued, despite my attempts to provide guidance throughout the school year . . . .

(Id.)   Notably, the evaluation included a comment on the May 13, 2009 incident with the Student, describing it as a "disturbing incident" in which Chen "acted inappropriately toward a student with whom she had problems," and noted Chen's "intransigence and unwillingness to claim responsibility for her inappropriate conduct toward the student."  (Id.)

***Rebuttal Letters***

Between August and September 2009, Chen submitted rebuttal letters to both the

6

counseling memorandum and her annual evaluation. (Pl.'s Opp'n 23.) With regard to her rebuttal to the counseling memorandum, Chen explained that "[the Student] should have thanked [her] for this extra freedom that other instructors seldom give to students when they set up their class rules or boundaries for students." (Matthew S. Porges Declaration, September 30, 2013 ("Porges Decl."), Ex. K.) Chen continued to defend her behavior in her rebuttal to the annual evaluation. (Id. Ex. L.)

**Non-Renewal as Acting Director of Asian Studies**

On July 7, 2009, Chen was notified by letter that her appointment as Acting Director of Asian Studies would not be renewed. (Pl.'s 56.1 ¶ 40.) Calichman replaced her as director of the program. (Id. ¶41.)

**Affirmative Action Complaint**

On August 25, 2009, Chen filed a complaint with CCNY's Office of Affirmative Action. (Coulston Decl. Ex. P.) In this complaint, Chen alleged that the Student had harassed her in violation of CCNY's policies and that she was retaliated against for reporting him to the Department. Specifically, she claimed that Defendants retaliated against her by giving her an unfavorable evaluation and not reappointing her as Director of the Asian Studies Program. (Id. Exs. P, Q.) The Office of Affirmative Action investigated the complaint and interviewed Chen, Calichman, Murphy, and Lesen. (Pl.'s 56.1 ¶ 44; Porges Decl. Ex. G.) The investigators found that the Student had not engaged in any actionable behavior and that CCNY had not retaliated against Chen. They further found that Chen's 2008-2009 evaluation was consistent with her previous evaluations and concluded that her "annual evaluation gave a fair and accurate representation of her performance, including her triumphs and shortcomings." (Coulston Decl. Ex. R.) The investigative report containing these findings was sent to Robert Paaswell, interim President of CCNY, on or about October 23, 2009. (Id.)

7

***Reappointment Process***

On October 15, 2009, the Department of Foreign Languages and Literatures Executive Committee met to consider the reappointment of eight professors in the Department, including Chen.  (Pl.'s 56.1 ¶ 48.)  The committee of five professors, which included Calichman, voted against reappointing Chen for the 2010-2011 academic year.  (Id. ¶¶ 49-50.)  According to the minutes of the meeting, there were three votes against Chen's reappointment and two abstentions.  All five members voted unanimously to reappoint the other seven professors under consideration.  (Coulston Decl. Ex. T.)

Chen was notified of the Committee's decision on October 20, 2009.  (Pl.'s 56.1 ¶ 51.) She appealed to the Humanities and the Arts Division's Personnel and Budget Committee (composed of the Department chairs of the eight academic departments within the Humanities and the Arts Division), (id. ¶¶ 52-53), and the College-Wide Personnel and Budget Review Committee (composed of the Deans of the eight academic Divisions and Schools and the Provost), (id. ¶¶ 56-57).  Each appeal was denied, the latter appeal by unanimous vote of all nine committee members.  (Id. ¶¶ 54, 58, 60.)  Calichman spoke against Chen at the divisional level in addition to the departmental level.  (Calichman Dep. 57:10-12, 58:20-22.)  As Dean of the Division of Humanities and the Arts, Dean Reynolds had a voice but not a vote on the divisional committee.  (Deposition of Stephen Jablonsky, March 2, 2012, ("Jablosky Dep.") 24:21-24.)  He did, however, have a vote in the College-Wide Personnel and Budget Committee.  (Paul F. Occhiogrosso Declaration, August 12, 2013 ("Occhiogrosso Decl."), ¶ 6.)

Chen's final appeal was to the President of CCNY, Robert Paaswal, acting as Interim President.  (Pl.'s 56.1 ¶ 59; see Occhiogrosso Decl. ¶ 7.)  In connection with her appeal, Chen submitted a letter in which she detailed her various contributions to CCNY.  She also raised various accusations of unequal treatment.  (Coulston Decl. Ex. FF.)  In particular, Chen

compared herself to two tenure track assistant professors who began in the Foreign Languages and Literatures Department at the same time as her.  She described one, Carlos Riobo, as "white, male American with Brazilian Heritage," and the other, Vanessa Valdes, as "black, female American with Puerto Rican Heritage."  She claimed that compared to the two professors, she was the only who was not reappointed despite having two books and four book contracts where the other two had none.  (Id.)  Chen also claimed that after she began working at CCNY, Calichman told her that he had "counted" only her academic publications in English, not Chinese, for purposes of determining her salary despite the fact that other full-time faculty members published books in their target languages.  (Id.)

By letter dated January 8, 2010, President Paaswell informed Chen that he had decided to deny her appeal and that "she would not be reappointed for the 2010-2011 academic year." (Pl.'s 56.1 ¶ 60.)  Chen subsequently requested, in accordance with the collective bargaining agreement between CUNY and her union, a statement of reasons for the President's denial of her appeal.  (Id.; Coulston Decl. Exs. C, JJ.)  By letter dated February 11, 2010, President Paaswell explained that Chen had "displayed seriously poor judgment" in connection with the incident involving the Student; that "qualities of personality and character" are to be considered in re-appointment decisions pursuant to the Bylaws of the Board of Trustees of the City University of New York; that in presenting "rules" to the Student, Chen had failed to perform the "guidance duties" required of her as a professor; and that her subsequent written response to the counseling meeting "demonstrate[d] that [Chen] failed to recognize the inappropriateness of [her] conduct." (Coulston Decl. Ex. C.)

### Other Complaints

Between October 20, 2009 and November 4, 2009, Chen filed a complaint with the New York State Division of Human Rights ("SDHR"), alleging discrimination and retaliation under

Title VII and the New York State Human Rights Law. (Porges Decl. Ex. D.) The complaint was received by CUNY on November 6, 2009. (Id.) On October 28, 2009, Chen filed a grievance through her labor union, challenging the decision not to reappoint her. (Id. Ex. M.) That grievance was mailed directly to Paaswell. (Id.)

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A court reviewing a motion for summary judgment must 'construe' the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)). Although the Second Circuit has noted that "an extra measure of caution" is needed in discrimination cases since direct evidence of discriminatory intent is rare, summary judgment nonetheless "remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citations omitted); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2011) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## DISCUSSION

### A.  Discrimination

Chen maintains that Defendants intentionally discriminated against her by not renewing her position as Director of the Asian Studies Program and not reappointing her for the 2010-2011 academic term.  (Pl.'s Opp'n 14.)

#### 1.  Discrimination by CUNY under Title VII

Employment discrimination claims under Title VII are evaluated under the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   At the first step, the plaintiff must establish a *prima facie* case of discrimination, by showing that (1) she belonged to a protected class, in this case, based on her gender, race, or national origin; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  See Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).  At the second step, once a *prima facie* case has been established, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the [adverse employment action]."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  "If the employer successfully carries [its] burden [of articulating a legitimate, non-discriminatory reason for the adverse employment action], the pattern of presumptions and burden shifts established by McDonnell-Douglas . . . drops away."  Adamczyk v. New York Dep't of Correctional Servs., 474 F. App'x 23, 25 (2d Cir. 2012) (quoting Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 113 (2d Cir. 2007) (internal quotation marks omitted).  At the last step, "the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  "To establish pretext, '[t]he plaintiff must produce not simply 'some' evidence, but

sufficient evidence to support a rational finding that the . . . reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'"   Lawless v. TWC Media Solutions, Inc., 487 F. App'x 613, 616 (2d Cir. 2012) (alteration in original) (quoting Weinstock, 224 F.3d at 42).

For purposes of deciding this motion, the Court assumes that Chen has established a *prima facie* case since Defendants[2] have articulated legitimate, non-discriminatory reasons for deciding not to renew her appointment as Director of Asian Studies or Professor for the 2010-2011 academic year, namely: "her poor judgment . . . and continued refusal to take responsibility for her conduct."  Defs.' Mem. 17-18; Coulston Decl. Ex. C; see Idrees v. City of New York, 04 Civ. 2197 (LAK) (GWG), 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) ("Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action."). The Court therefore turns to the final step of the McDonnell-Douglas analysis.   The pertinent question here is whether the evidence is sufficient "to support a rational finding that the . . . reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  Lawless, 487 F. App'x at 616 (quoting Weinstock, 224 F.3d at 42).  The Court finds that it is not.

As the Second Circuit noted in Richardson v. Comm'n on Human Rights & Opportunities, "where there is overwhelming evidence that the employer had a legitimate reason to dismiss an employee, the employee must present more than [a] few isolated pieces of contrary evidence to survive summary judgment."  532 F.3d 114, 125 (2d Cir. 2008) (citing Getschmann

---

[2]     Although Title VII applies only to CUNY, as "individuals cannot be held personally liable under Title VII," Humphries v. City Univ. of New York, 13 Civ. 2641 (PAE), 2013 WL 6196561, at *5 (S.D.N.Y. Nov. 26, 2013), the parties refer to "Defendants" collectively throughout their briefs and the Court thus does so as well.

v. James River Paper Co., 822 F. Supp. 75, 78 (D. Conn. 1993)).  Here, there is overwhelming evidence in the record that Defendants' decision not to renew Chen's appointment as Director of Asian Studies or Professor for the 2010-2011 academic year was based on legitimate, non-discriminatory reasons.  Indeed, the Court shares Defendants' view that Chen's decision to ask the Student to sign the document entitled "Ya-chen Chen's Written Document for [the Student's] Confirmation of Understanding (to avoid different versions of the same story)" was "disturbing," (Coulston Decl. Ex. L), and "inappropriate," (Defs.' Mem. 2.), as was her behavior thereafter.  In response, Chen puts forth only speculative arguments as to why Defendants' legitimate, non-discriminatory reasons are false; a comparison to two other professors who were reappointed for the 2010-2011 academic year without any evidence that they engaged in remotely similar behavior; and passing references to isolated incidences of alleged differential treatment.  Indeed, there is no evidence in the record that Defendants' failure to renew Chen's Directorship or appointment as Professor for the 2010-2011 academic year had anything to do with Chen's gender, race, or national origin.[3]

Although Chen asserts that Defendants' reasons for deciding not to renew her Directorship or reappoint her for the 2010-2011 academic year are pretextual because she "handled [the Student's] harassment of her as directed by Lesen," (Pl.'s Opp'n 16), there is no evidence that Lesen instructed Chen to (1) speak to the Student immediately, before he actually enrolled in her class; (2) set out a list of boundaries in writing; or (3) ask the Student to sign "Ya-chen Chen's Written Document for [the Student's] Confirmation of Understanding (to avoid different versions of the same story)" before enrolling in her class.  Chen may indeed have believed that she was following Lesen's instruction when she set up the meeting with the

---

[3]      Thus, although the Court has assumed that Plaintiff has established a *prima facie* case for purposes of deciding this motion, it notes that Defendants have a compelling argument as to why Plaintiff has not even established that the alleged adverse employment actions occurred under circumstances giving rise to an inference of discrimination.

Student. Nevertheless, her subjective belief does not excuse her actions and subsequent refusal to acknowledge the inappropriateness of her behavior, nor does it show pretext on the part of Defendants.

The other facts on which Chen relies are likewise insufficient to support "a rational finding that the . . . reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action[s]." Lawless, 487 F. App'x at 616 (quoting Weinstock, 224 F.3d at 42). Chen notes that Calichman criticized her "lack of collegiality," (Coulston Decl. Ex. L; Pl.'s Opp'n 17.), but argues that "collegiality is not a basis for evaluating whether junior, untenured faculty members should be reappointed." (Pl.'s Opp'n 17.) As Paaswell explained to Chen in his February 2010 letter, however, "the qualifications for 'appointment' to the position of Assistant Professor set forth in . . . the Board's Bylaws are relevant, as well, to the consideration of reappointment." (Coulston Decl. Ex. C.) Such qualifications include "qualities of personality and character." (Id. Ex. II.) Moreover, there is no support in the record for the proposition that reference to her lack of collegiality was a guise for discrimination or that the term is a discriminatory label or code word. See Weinstock, 224 F.3d at 44 (finding that "nice" or "nurturing" were not "code words for gender bias"). While Chen states that Lesen's criticism and instructions to repeat the word "stop" humiliated her and constituted "linguistic racial discrimination," (Chen Dep. 64:13-65:19), her "'[feelings and perceptions] of being discriminated against are not evidence' of discrimination." See Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999) (alterations in original) (quoting Fisher v. Vassar Coll., 70 F.3d 1420, 1439 (2d Cir. 1995)).

Chen claims that she was treated differently from two "similarly situated" professors who joined the Foreign Languages and Literatures Department at the same time as her and were both reappointed for the 2010-2011 academic term: Vanessa Valdes (who Chen describes as "black,

female American with Puerto Rican Heritage") and Carlos Riobo (who Chen describes as "white, male American with Brazilian Heritage").   (Coulston Decl. Ex. FF; Pl.'s Opp'n 29-30.) Although Chen testified that Calichman complained about Valdes' interpersonal skills and that Valdes once had a grading issue with a student, (Chen Dep. 436:20-439:25), Chen has presented no evidence that Valdes' grading issue rose to the same level of inappropriateness as Chen's conduct with the Student.  Further, Chen has not presented evidence that Riobo was even the subject of a complaint or negative comment by anyone at CCNY.

Chen further notes in passing in her opposition brief that "her publications in Chinese were not counted for the purposes of determining her salary, while publications in other languages, such as Spanish, were counted for other professors."  (Pl.'s Opp'n 2.)  However, she makes no effort to connect this allegation to her Title VII, § 1983, or NYCHRL discrimination claims, nor does she provide evidence of this alleged differential treatment other than her own testimony, itself based in part on the hearsay statement of Professor Riobo regarding the counting of his publications.  (Chen Dep. 394:19-395:17.)  Chen's statement, also made only in passing, that Professor Calichman gave her only one course release "even though the grant which was paying for Chen's work provided for her to have more than one," (Pl.'s Opp'n 2), and Chen's assertion that "according to all the people who got that grant, I was probably the only one without the same treatment," (Chen Dep. 304:3-5), are likewise insufficient to create a genuine issue of fact for trial.   Accordingly, CUNY is entitled to summary judgment on Chen's discrimination claim under Title VII.

## 2.  Discrimination by Individual Defendants under § 1983

"In the Second Circuit, employment discrimination claims brought under the Equal Protection Clause are analyzed under the same three-step McDonnell Douglas test for claims brought pursuant to Title VII of the Civil Rights Act of 1964."  Potash v. Florida Union Free

Sch. Dist., 10 Civ. 3299 (ER), 2013 WL 5273792, at *13 (S.D.N.Y. Sept. 18, 2013); see Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) ("The elements of one are generally the same as the elements of the other and the two must stand or fall together.").  Consequently, the Individual Defendants are entitled to summary judgment on Chen's equal protection claim under § 1983 for the same reasons that summary judgment is appropriate with respect to Chen's discrimination claim under Title VII.

### 3.  Discrimination by Individual Defendants under NYCHRL

As the Second Circuit recently noted, "it is unclear whether, and to what extent, the McDonnell-Douglas burden-shifting analysis has been modified for NYCHRL claims."  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 n.8 (2d Cir. 2013).  The Court explained that it was not necessary to resolve the issue since "the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions."  Id. (alteration in original) (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 38, 40 n.27 (1st Dep't 2009).

For the reasons described above, Chen has failed to put forth sufficient evidence to create a genuine issue of fact that discrimination played any role in Defendants' actions.  Accordingly, the Individual Defendants are entitled to summary judgment on Chen's discrimination claim under § 8-107(1) of the NYCHRL.

### B.  Retaliation

Chen next argues that Defendants' failure to renew her appointment as Director of Asian Studies and failure to reappoint her as Professor for the 2010-2011 academic year were

retaliation for her various complaints of discrimination and retaliation.   Defendants have assumed for the purposes of this motion that Chen's complaint with the Affirmative Action Office was a protected activity.   (Defs.' Mem. 19 n.6.)   The Court need not address whether Chen's other alleged complaints constitute protected activities to resolve this motion since Chen cannot establish the requisite causal connections between any alleged complaint and adverse employment action.

### 1.  Retaliation by CUNY under Title VII

To state a *prima facie* case of retaliation under Title VII, Chen must show evidence of the following:

> (1) that she engaged in protected [activity] under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action . . . .

Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks omitted) (quoting Sumner v. United States Postal Service, 899 F.2d 203, 208-09 (2d Cir.1990)). Title VII retaliation claims are reviewed under the same McDonnell-Douglas burden-shifting framework used to analyze Title VII discrimination claims.   Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003).   The Supreme Court has recently clarified that "Title VII retaliation claims must be proved according to traditional principles of but-for causation."   Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).[4]   Thus, "[i]f the defendant [articulates a legitimate, non-

---

[4]     Plaintiff is mistaken that Nassar does not apply to this action.  See Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 98 (1993) ("[T]he legal imperative 'to apply a rule of federal law retroactively after the case announcing the rule has already done so' must 'prevai[l] over any claim based on a Chevron Oil analysis.'") (alteration in original) (quoting James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 540 (1991)); Sass v. MTA Bus Co., 10 Civ. 4079 (MKB), 2014 WL 585418, at *5 (E.D.N.Y. Feb. 14, 2014) ("[T]he new standard for retaliation applies retroactively to all cases still open on direct review.").  Nevertheless, she asks for the "opportunity to conduct further discovery relating to that heightened causation standard."  (Pl.'s Opp'n 27.)  She does not, however, substantiate this request with any explanation as to why further discovery would be necessary or what, if anything, she would seek to discover which she has not already had the opportunity to discover.  In connection with this motion, Plaintiff submitted the depositions of nine witnesses, including all Defendants and the chairs of each reappointment committee.  In light of the extensive discovery that has already occurred, the Court cannot say that

retaliatory reason for the adverse employment action], the plaintiff must offer 'proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"   Brooks v. D.C. 9 Painters Union, 10 Civ. 7800 (JPO), 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) (quoting Nassar, 133 S.Ct. at 2533).

Even assuming, as before, that Chen has established a *prima facie* case of retaliation, Defendants have articulated legitimate, non-retaliatory reasons for not renewing Chen's appointments.  The question is therefore whether the evidence is sufficient to support a rational finding that any of her complaints were a but-for cause of Defendants' alleged retaliatory conduct.  The Court finds that it is not.

Chen attempts to demonstrate retaliation indirectly through a timeline of "some of the most significant events" pertinent to this action, (Pl.'s Opp'n 23), noting that:

> Chen's multiple complaints were followed in short proximity by either adverse employment actions or denials of appeals for the non-reappointment.  Most notable among those incidents of proximity are the following: (1) Chen was non-renewed as Director within weeks after she made complaints in her two rebuttal letters after the counseling meeting and the 2008/2009 evaluation; (2) The [Personnel and Budget] committee denied Chen's appeal less than a week after Chen submitted a grievance of her non-reappointment and less than a week after Chen submitted her appeal letter to [the Personnel and Budget] committee, which letter mentioned her membership in three protected classes; (3) The Review Committee denied Chen's appeal within two weeks after Defendants learned of [Chen's] SDHR filing; and (4) Paaswell gave his initial denial of Chen's appeal less than a month after he received Chen's appeal/complaint letter.

(Id. 23-24.)

Even under the pre-Nassar "motivating factor" standard, "[t]emporal proximity—while enough to support a prima facie case—[was without more] insufficient to establish pretext." Dall v. St. Catherine of Siena Med. Ctr., 11 Civ. 0444 (MKB), 2013 WL 4432354, at *23

---

Plaintiff was not "afforded a meaningful opportunity to establish the facts necessary to support [her] claim." In re Agent Orange Prod. Liab. Litig., 517 F.3d 76, 103 (2d Cir. 2008).  It therefore denies Plaintiff's request for further discovery and has decided this motion accordingly.

(E.D.N.Y. Aug. 14, 2013) (quoting Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 19 (2d Cir. 2013)); see also El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). Most significantly, Chen's timeline omits the May 13, 2009 incident with the Student, which highlights that Defendants' decision not to reappoint her as Director of the Asian Studies Program and as Professor were the result of her own actions. (See Coulston Decl. Ex. H.) Defendants' actions, contrary to constituting evidence of retaliation for Chen's complaints, are entirely consistent as a progressive response to Chen's "disturbing incident" with the Student, (Coulston Decl. Ex. L), beginning with the counseling meeting held soon thereafter and ending with her ultimate termination. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Indeed, there is ample evidence that Chen's reappointment had been called into question long before she filed the affirmative action complaint (and subsequent grievances) and was an issue about which Chen herself expressed concern on multiple occasions. (See Murphy Dep. 68:13-16 ("After [the counseling meeting], she followed me back to my office. She followed me into my office, closed the door and asked me how this would affect her tenure and promotion"); Coulston Decl. Ex. G. ("Finally, after refusing to even acknowledge that she understood anything I explained to her numerous times she asked if there was anything she could do that would make her look better in this situation.").) The evidence does suggest that Calichman, Murphy, and Paaswell were aware of Chen's affirmative action complaint and that

President Paaswell was aware of her grievance through her union.[5]  This evidence alone, however, is plainly insufficient to allow a reasonable jury to conclude that either complaint was a but-for cause of Defendants' failure to reappoint her as Professor for the 2010-2011 academic year.  Accordingly, CUNY is entitled to summary judgment on Chen's claim for retaliation under Title VII.

### 2.  Retaliation by Individual Defendants under NYCHRL

Section 8–107(7) of the NYCHRL makes it unlawful for employers "to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter."  N.Y.C. Admin. Code § 8–107(7).

While the Court is solicitous of NYCHRL's "uniquely broad and remedial purposes," Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 35 (N.Y. 2011), Chen's alleged evidence of retaliation is insufficient to raise an issue of fact "that retaliation played any part in the employer's decision."  Mihalik, 715 F.3d at 116.  Accordingly, the Individual Defendants are entitled to summary judgment on Chen's retaliation claim under § 8-107(7) of the NYCHRL.

### C.  Aiding & Abetting by Individual Defendants

Chen's final claim against the Individual Defendants is for aiding and abetting acts of discrimination and retaliation under § 8-107(6) of the NYCHRL.  "Aiding and abetting is only a

---

[5]     Chen does not indicate that any of the relevant decision-makers were aware of Chen's complaint with SDHR, although the Court's decision would be the same even if she had presented evidence of such knowledge.

viable theory when an underlying violation has taken place." Caravantes v. 53rd St. Partners, 09 Civ. 7821 (RPP), 2012 WL 3631276, at *20 (S.D.N.Y. Aug. 23, 2012) (quoting Falchenberg v. N.Y. State Dep't of Educ., 338 F. App'x 11, 14 (2d Cir. 2009)).   Given that the Court has granted Defendants' motion for summary judgment with respect to Chen's discrimination and retaliation claims, the Individual Defendants are entitled to summary judgment on Chen's aiding and abetting claim.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is granted in its entirety and the action is dismissed with prejudice. The Clerk of Court is directed to close the motion pending at docket number seventy (70) and to close the case.

SO ORDERED.

Dated:       March 31, 2014
             New York, New York

Ronnie Abrams
United States District Judge